**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER GERALD SMITH, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:17-cv-00117 SRC |
| | ) | |
| BOB HOLDER, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants Ashley Grisham and Dr. Charles Pewitt's Motion for Summary Judgment [126] and Defendants Bob Holder, Nicole Green, Jimmie Smith, and Dunklin County's Motion for Summary Judgment [129]. The Court grants the motions. The Court dismisses all claims, with prejudice.

## I.    BACKGROUND

On July 24, 2017, Plaintiff Christopher Gerald Smith filed a complaint in this Court under 42 U.S.C. § 1983 alleging Defendants Bob Holder, Nicole Green, Ashley Grisham, Dr. Pewitt, and the Dunklin County Justice Center violated his constitutional rights under the 1st, 8th, and 14th Amendments of the U.S. Constitution and his rights under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"). The Court appointed *pro bono* counsel for Smith on December 4, 2017. Smith also filed two other complaints in this district against the same defendants, along with Jimmie Smith, with similar legal and factual issues. *See Smith v. Green*, No. 1:17CV00144 JMB; *Smith v. Green*, 1:17CV00154 CAS. The Court consolidated the three cases.

The Court liberally construes Smith's complaints to include the following claims:

(1) Holder, Dr. Pewitt, Grisham and Green denied Smith a specific type of insulin to treat his diabetes;

(2) Holder, Grisham, and Green retaliated against Smith for filing a grievance by placing him on medical watch and telling jail staff not to answer the emergency call button if Smith pressed it;

(3) Holder and Dunklin County failed to place emergency call buttons in individual cells;

(4) Holder and Dunklin County failed to create sick-call procedures;

(5) Grisham and Green placed a wooden board over the window of his cell to prevent him communicating with jail staff and other inmates;

(6) Grisham, Green, and Holder tampered, or allowed other inmates to tamper, with Smith's food;

(7) Holder, Dr. Pewitt, Grisham, and Green denied Smith medical treatment for his infected finger;

(8) Grisham, Green, and Holder refused to provide Smith with a proper diabetic diet;

(9) Holder and Dunklin County instructed jail staff to refuse to respond to call buttons;

(10) medical malpractice, medical negligence, and breach of duty against Green;

(11) intentional infliction of emotional distress against Green;

(12) Holder, Green, Jailer Smith, and Dunklin County retaliated against Smith by turning off water to handicapped showers;

(13) Holder, Green, and Jailer Smith placed him in administrative segregation without due process of law;

(14) Holder, Green, Smith, and Dunklin County violated the Americans with Disabilities Act and the Rehabilitation Act by refusing to turn the water on in handicapped showers;

(15) Holder, Grisham, Green, Dr. Pewitt, and Jailer Smith retaliated against Smith for filing grievances by refusing to move Smith back to general population.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally

construed, . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers."). Smith brings each of these claims against each defendant in his/her individual and official capacities.

A. *Undisputed Material Facts*

1. Medical Care

The Dunklin County Adult Detention Center ("the Jail") booked Smith in on June 27, 2017. The Jail housed Smith for the U.S. Marshals Service ("USMS"). Smith was released from the Jail and transferred into the custody of the USMS on August 13, 2018. The USMS sets requirements and procedures that the Jail must follow with regards to inmates that the Jail is housing for the USMS. Unless there is a medical emergency, the USMS requires the Jail to obtain approval from it before the Jail can transport an inmate to an outside medical provider for medical treatment. Sheriff Holder is responsible for the general operation of the Jail and Jail Administrator Green is responsible for managing the day-to-day operations and administration of the Jail and its records. Jailer Smith was the lead supervisor at the time Smith was in the Jail.

In 2007, Dunklin County entered into a contract with Advanced Correctional Healthcare, Inc. ("Advanced") for it to provide health care services to inmates at the Jail. Advanced has provided health care services to the inmates at the Jail since the contract was entered in 2007. Pursuant to the contract, Advance provides an on-site nurse to be at the Jail for 30 hours each week and provides a physician at the Jail once a week. Nurse Grisham has been the primary on-site nurse assigned to the Jail since 2013. Dr. Pewitt has been the primary physician assigned to the Jail since 2012. Dr. Pewitt goes to the Jail every Tuesday night. Dunklin County does not pay Dr. Pewitt or Nurse Grisham directly for their services.

Smith has had diabetes mellitus (Type I) since he was approximately 20 years old. Smith has taken a variety of insulin types since the time of his diagnosis. At the time he was booked

into the Jail, Smith received 70/30 insulin twice a day.[1]  Nurse Grisham saw Smith on the day he was booked into the Jail.  She noted his blood sugar reading was "high" and notified Dr. Pewitt, who saw Smith that same evening.  Dr. Pewitt prescribed Smith 10 units of 70/30 insulin twice a day. Smith began receiving the prescribed insulin on June 28, 2017. His insulin was adjusted on the same date and he began receiving the adjusted dose of insulin that day. On June 29, Smith's insulin dose was again adjusted and he began receiving the adjusted dose in the morning on June 30. On this same date, Smith's insulin dose was again adjusted and he began receiving the adjusted dose in the evening of that date.  Dr. Pewitt ordered Smith's blood sugar be checked every two hours and to remain near the nurse until further notice.  He also ordered Smith to have no snacks and receive a diabetic meal tray.  The medical records contain a glucose log and medication administration record which indicate that Smith's glucose level was checked multiple times per day and he was administered medication.

On July 3, Smith's insulin dose was again adjusted and he began receiving the adjusted dose on July 4.  On July 6, Smith completed a Sick Call Request form about his right hand. Nurse Grisham saw Smith on that date and the medical record indicates Smith hit a door with his fist. Smith's hand was almost three times its normal size and infected.  Nurse Grisham believed Smith should be sent to the emergency room for further evaluation of his hand. A Prisoner Medical Request form was submitted to the USMS to request approval to transport Smith to an outside medical provider for medical treatment for his hand. The USMS approved this request. On July 10, Smith was transported to Twin Rivers Regional Medical Center for medical

---

[1] At the time Defendants filed their motions for summary judgment, they did not attach an affidavit authenticating the medical records submitted in support of their motions.  An affidavit has since been submitted permitting the Court to rely on the affidavits in analyzing the motions for summary judgment.

treatment of his hand. Twin Rivers diagnosed Smith with cellulitis in his right finger. Twin Rivers prescribed 500 mg. of Amoxicillin twice a day for ten days.

Smith began receiving Amoxicillin at the Jail on July 11. The Jail dispensed Smith Amoxicillin until July 17. On that date, a medical staff member at the Jail examined Smith's right hand again. The medical staff discontinued the Amoxicillin and instead, prescribed Bactrim. Smith began receiving Bactrim on July 17. On July 19, a medical staff member at the Jail examined Smith's right hand again. The medical staff also adjusted his insulin. The medical record for Smith's medical examination on this date states "ok to move to gen. pop." Smith began receiving the adjusted dose of insulin on July 20.

On July 26, Smith's medical records, under "Practitioner's orders," states, "Just take away all Sweets None at all." On July 27, the medical staff again adjusted Smith's insulin. He began receiving this dose on July 28. On August 8, medical staff examined Smith at the Jail. Medical records state Smith's diabetes is controlled while under observation and to "move back to holding cell to keep under close monitoring of meds & diet." On August 15, medical staff at the Jail examined Smith and discontinued his prior insulin. They prescribed Smith 30 units of Lantus insulin instead. The Jail dispensed Smith Lantus insulin starting August 16. On August 22, medical staff at the Jail examined Smith and adjusted his dose of Lantus insulin. He began receiving this adjusted dose on August 23. The staff also ordered an "Orthopedic Consult." The Jail submitted a Prisoner Medical Request form to the USMS to request approval to transport Smith for an orthopedic consult, which the USMS approved. An orthopedic doctor saw Smith.

On August 29, medical staff at the Jail adjusted Smith's Lantus insulin and he began receiving the adjusted dose on August 30. Smith began receiving another adjusted dose on September 6. On September 12, medical staff at the Jail examined Smith. His medical records

state his blood sugar was poorly controlled and he did much better when taking the 70/30 insulin. The medical staff discontinued the Lantus insulin and placed Smith back on the 70/30 insulin. Smith began receiving the 70/30 insulin on September 12.

On September 15, Nurse Grisham ordered Smith be placed back in medical observation. On September 26, medical staff at the Jail examined Smith and adjusted his insulin. He began receiving this dose on September 27. This occurred again on October 3, and he began receiving the adjusted dose on October 4. His medical records for this examination state "ok to return to gen. pop." On October 10, medical staff at the Jail examined Smith and adjusted his dose of insulin which he began receiving on October 11. His medical records for this examination state "he was in isolation & diet was monitored & he was doing fine – When he is returned to gen population, he often eats whatever he wants & BS go high."

On October 17, medical staff adjusted the dose of Smith's insulin which he began receiving on October 18. Smith refused his insulin on October 18 and 19. On October 24, medical staff ordered an "Endocrinologist Consult" for Smith. The Jail submitted a Prisoner Medical Request form to the USMS to request approval to transport Smith to an endocrinologist; the USMS approved the request. On November 14, Smith saw Dr. Shaun Ross, an endocrinologist. Dr. Ross changed Smith's insulin to Novolog 15 units before meals and Lantus 50 units before bedtime. On November 15, the Jail began dispensing Novolog insulin to Smith and on November 16, it began dispensing Lantus insulin to Smith.

On November 15, Smith's blood sugar was high and he was taken to the emergency room at Twin Rivers Regional Medical Center. Twin Rivers discharged him the same day. Nurse Grisham ordered Smith moved back to the medical observation cell. On November 22, Nurse Grisham received clarification from Dr. Ross's office regarding Smith's insulin and Smith began

receiving adjusted doses of Lantus and Novolog insulin on the same date. On December 5, medical staff examined Smith and his medical records on this date state "ok to return to gen pop."

Since December 5, Smith has not returned to the medical observation cell. Smith believes he has received adequate insulin and diabetic medical treatment at the Jail since Dr. Ross saw him. The Jail has sick call procedures, as Smith agrees. Sheriff Holder was not responsible for reviewing the sick call request forms submitted by inmates at the Jail and he did not review any sick call request forms submitted by Smith.

2.  Dr. Pewitt and Nurse Grisham

Ashley Grisham is a licensed practical nurse and Dr. Pewitt is a medical doctor licensed to practice medicine. Both Nurse Grisham and Dr. Pewitt provide care to inmates through their employment with Advanced.

Dr. Pewitt considers Type 1 and Type II diabetes a serious medical condition. Dr. Pewitt believes Smith's Type I diabetes was stable if Smith was put in a controlled environment where his food intake and medications could be monitored. Dr. Pewitt also believes Smith's blood sugar was better controlled when Smith stayed in an isolation cell. Dr. Pewitt does not know how many times he authorized Smith to be placed in medical observation. Staff at the Jail needed Dr. Pewitt's authorization to place an individual in the medical isolation cell.

Smith alerted Dr. Pewitt he had a history of liver disease yet Dr. Pewitt signed off on Smith receiving two medications that included warnings not to be prescribed to patients with severe liver disease. Dr. Pewitt testified he signs medical forms without looking at them. Dr. Pewitt sent Smith to see Dr. Ross because of personal reasons; Smith was not compliant and would not work with the Jail's medical officials.

3. Food Service

Dunklin County contracts with Tiger Correctional Services ("TCS") to provide onsite meal preparation services and commissary items for inmates at the Jail. TCS provided these services at the Jail when Smith was housed there. TCS provides all of the food, food trays, and utensils that are used to prepare and serve meals at the Jail. TCS assigns two individuals to prepare meals served to inmates. Dunklin County does not pay, compensate, or employ the two individuals who prepare the meals. Four inmates assist the two TCS workers in preparing and serving the meals. TCS has a nutritionist that determines the menu for each meal prepared and served to inmates. TCS has a diabetic food menu that it serves to inmates with diabetes.

Plaintiff did not receive a diabetic meal the first one to two weeks after his arrival at the Jail on June 27. Since then, he has continuously received a diabetic food tray. Smith alerted Jail officials he required diabetic meals but was not receiving them. As a diabetic, Smith is limited on what and how much he may eat. Smith does not have any knowledge or information that anyone at the Jail specifically ordered or instructed anyone not to give Smith a diabetic food tray. Smith does not have any knowledge that Sheriff Holder or Jail Administrator Green ever ordered or instructed someone not to give Smith all of the food that should be on Smith's diabetic food tray.

4. Dunklin County Sheriff Office's Correctional Officers' Manual

Section 113(II)(6) of the Manual for Corrections Officers of the Dunklin County Sheriff's Office ("the Manual") states "inmates cannot be denied medical or dental care." Section 118(III)(9) states "medical and dental treatment is available when needed." Section 117(II)(4) states "inmates with proof of special dietary needs will be provided with those needs."

5. Housing Pods and Jail Cells

The Jail has nine separate housing pods labeled alphabetically Pod A to Pod I. Each of the nine housing pods have cells located adjacent to a large dayroom where inmates can perform recreational activities. There are nine cells adjacent to the booking area at the jail, each with a sink, toilet, and bed. There is one medical observation cell adjacent to the medical examination room. Inside is a sink, toilet, and bed. The medical examination room has a shower.

Smith was housed in the medical observation cell, the booking cells, and the general population cells in Pods H, I, and E. He was moved to the medical isolation cell and booking cells on multiple occasions. Smith was held in medical isolation from July 28, 2017, until September 2017. Smith has no information or knowledge that Sheriff Holder or Jail Administrator Green ever instructed or ordered Smith to be placed in or transferred to the medical observation cell.

Smith was denied recreation time on multiple occasions. He testified it is stressful being in jail and being denied recreation time for multiple days at a time. Smith does not have any information or knowledge that Sheriff Holder ever ordered or instructed anyone not to allow Smith recreation time or access to recreation time while at the Jail.

6. Boarded Window

Smith has no idea who placed the board in the window of the medical observation cell. When some officers removed the board covering the window, Jail supervisors would come by and put the board back up. Smith has no information or knowledge that Sheriff older ever ordered or instructed anyone to put a board in the window of the medical observation cell. Jail Administrator Green did not place a wooden board over the window and never instructed or ordered anyone to do so.

7.      Call Buttons

A call button is an intercom that allows an individual to call the jailers working in the Jail control room to speak with them. The Dunklin County Sheriff's Office has a policy that all jailers working in the control room of the Jail must answer a call button when it is pressed by an inmate. The jailers must follow the policies of the Sheriff's Office, including this policy to answer a call button when it is pressed. Each of the nine booking cells has a call button, as does the medical observation cell and the dayroom in each of the housing pods. Individual cells in general population do not have call buttons.

When held in general population cells, Smith did not have access to a call button from 10:00 P.M. to 5:30 A.M. Smith's cellmate had multiple seizures. Smith could not use a call button for help while his roommate had a seizure until he gained access to the buttons at 5:30 A.M.

When Smith pressed the call buttons for aid, Jail officials failed to answer on multiple occasions. Smith never heard Sheriff Holder, Jail Administrator Green, or Jailer Smith order anyone not to answer the call buttons. Smith does not have any information or knowledge that Sheriff Holder, Jail Administrator Green, or Jailer Smith instructed or ordered anyone not to answer any call buttons.

8.      Handicap Accessible Shower Stalls

Each of the nine housing pods has one handicap accessible shower. Each handicap accessible shower stall has a steel bench to sit on and two steel grab bars on the walls. Inmates may use the handicap accessible shower without specifically asking permission from a jailer. Every shower in the housing pods, including the handicap accessible showers, should have a shower curtain.

Smith never asked Sheriff Holder, Jail Administrator Green, or Jailer Smith for access to the handicapped shower stalls. Smith fell in the shower one time resulting in a bump on his head. He stated these injuries were "nothing significant." He did not submit a sick call request for these injuries.

Smith alleges he needs to use the handicap shower because he gets off balance sometimes and has neuropathy in his feet and legs. Smith got dizzy while at the Jail many times; when it occurred, he would inform the officer working and Nurse Grisham. Smith had access to a handicap shower in the medical observation unit. He saw someone use the handicap shower stall in H pod and it had a curtain and worked properly.

## II.     STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the moving party meets

this initial burden, the non-moving party must then set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). The non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## III.    DISCUSSION

As outlined in Section I, Smith asserts 15 different claims against the various defendants in this matter that remain pending.  These claims include allegations of inadequate medical care, retaliation for filing grievances, failure to place emergency call buttons in cells, failure to provide accommodations for Smith's disability, and several state law claims.  Defendants raise several

arguments in support of summary judgment, which the Court does not list due to the length of the arguments.

## A. Smith's Status as Pretrial Detainee and Prisoner

From June 27, 2017, until March 12, 2018, when Smith pled guilty to a federal offense, the USMS held Smith in the Jail as a pretrial detainee. After his plea of guilty on March 12, 2018, Smith was a convicted prisoner. Smith's change in status from a pretrial detainee to a prisoner does not affect the Court's analysis of his claims. The Eighth Amendment imposes duties on prison officials with regards to inmates. *Christian v. Wagner*, 623 F.3d 608, 612 (8th Cir. 2010). But it does not apply to pretrial detainees; instead, the Due Process Clause of the Fourteenth Amendment imposes similar duties on jailers of detainees. *Id*. at 613. "'[U]nder the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great protection' as that afforded convicted prisoners under the Eighth Amendment.'" *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Therefore, the Court's analysis regarding the constitutional duties imposed by the Eighth Amendment equally applies to Smith's time as a pretrial detainee under the Fourteenth Amendment.

## B. Municipal Liability Claims

Section 1983 of Title 42 allows individuals to bring causes of action for violations of the U.S. Constitution. The section states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  A municipality can be sued under § 1983 for an officer's misconduct where the misconduct is alleged to have implemented or executed a policy, ordinance, regulation, decision, or custom of the municipality.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  A municipality cannot be held liable under § 1983 on a *respondeat superior* theory.  *Id.* at 691.  When a plaintiff sues an officer in his/her official capacity, it "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.* at 166.  The Court analyzes Smith's claims against individual defendants in their official capacities as claims against Dunklin County.

### C.     Inadequate Medical Care – Diabetes

Smith asserts several claims against Sheriff Holder, Nurse Grisham, Dr. Pewitt, Jail Administrator Green, and Dunklin County alleging he received inadequate medical care for his diabetes in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Specifically, Smith alleges Sheriff Holder, Dr. Pewitt, Nurse Grisham, and Jail Administrator Green denied Smith adequate medical care by providing him with generic insulin rather than Humalog or Lantus insulin, and he alleges they failed to provide him with a proper diabetic diet at times.

The Eighth Amendment requires prison officials to provide inmates with medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citations and quotations omitted).  Claims of medical malpractice or negligence in diagnosing or treating a

medical condition do not state a valid claim for inadequate medical treatment in violation of the Eighth Amendment. *Id*. at 106. To establish a claim, a prisoner must show he "suffered objectively serious medical needs" and that the defendants "actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). "[P]rison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment or [] prison doctors who fail to respond to a prisoner's serious medical needs" demonstrate deliberate indifference. *Id*. "Deliberate indifference is akin to criminal recklessness." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). "Jailers bear only the responsibility to identify medical needs that are so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jenkins v. Cty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009) (internal quotations omitted).

"Prisoners do not have a constitutional right to a particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). "Nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment." *Id*. "[T]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii*, 512 F.3d at 499.

The undisputed evidence in this case establishes that Smith did not receive inadequate medical care for his diabetes. Over the course of approximately five months, Nurse Grisham, examined Smith, Dr. Pewitt examined Smith, and he was taken to an endocrinologist, Dr. Ross, outside the jail for examination, as well as a hospital, twice. Medical professionals adjusted his insulin approximately 17 times, after each adjustment, the Jail provided the adjusted dose of insulin with 24 hours. No defendant was deliberately indifferent to Smith's serious medical needs as to his diabetes.

Although Smith complains he did not receive the specific type of insulin he requested, this does establish a constitutional violation because a prisoner has no right to a particular and requested course of treatment. *Dulany*, 132 F.3d at 1239; *see also Long*, 86 F.3d at 765 ("Prisoners do not have a constitutional right to any particular type of treatment."). The record establishes that Dr. Pewitt, Nurse Grisham, and Dr. Ross changed the type of insulin Smith received based on the effectiveness of the insulin on lowering Smith's blood sugar. At various times, the medical professionals prescribed Smith 70/30, Lantus, and Novolog insulin. Smith cites no facts indicating any defendant was deliberately indifferent to his diabetes or that he was refused medical treatment for his diabetes. He simply disagrees with the course of treatment provided to him, but that does not create a sufficient basis for an Eighth Amendment violation. *See Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985) (finding that a disagreement with medical treatment does not constitute a constitutional violation); *see also Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (same).

Smith also asserts Defendants were deliberately indifferent to his serious medical need by denying him diabetic meal trays. The undisputed facts show that Smith did not receive diabetic meal trays for the first one to two weeks after he arrived at the Jail. Since then, he has continuously received a diabetic meal tray. When an inmate alleges a delay in medical treatment, "the objective seriousness of the deprivation should [] be measured by reference to the effect of delay in treatment." *Laughlin*, 430 F.3d at 929 (internal quotations omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id*. Smith has not placed any evidence in the record establishing that his delay in receiving diabetic meal trays had a detrimental effect on

him.  Additionally, while he did not receive a diabetic meal tray upon entering the Jail, he was immediately seen by Dr. Pewitt on June 27th and prescribed insulin to treat his diabetes.

Viewing the facts and all reasonable inferences in a light most favorable to Smith, the Court concludes no defendant violated Smith's constitutional rights because they were not deliberately indifferent to his serious medical needs for his diabetes.  The Court grants summary judgment in favor of Defendants on these claims and dismisses them.

### D.        Inadequate Medical Care – Right Hand

Smith also asserts a claim for inadequate medical care in violation of the Eighth and Fourteenth Amendments for an injury he endured to his right hand and an alleged failure by Jail officials to create sick call procedures.  The undisputed facts show that on July 6th, Smith completed a Sick Call Request Form and he was seen by Nurse Grisham on that date.  Smith hit a door with his fist.  Nurse Grisham believed he should be sent to the emergency room and a request form for transport was submitted to and approved by the USMS.  On July 10th, Smith was transported to the Twin Rivers Regional Medical Center where a doctor diagnosed him with cellulitis in his right finger.  The doctor prescribed Amoxicillin to be taken twice a day for ten days.  Smith received Amoxicillin on July 11th to July 17th.  Medical staff at the Jail reexamined his hand at that time and prescribed him Bactrim, which he began receiving on July 17th.  On July 19th, medical staff again examined his hand.  On August 23rd, medical staff ordered an orthopedic consult which was approved by the USMS.  An orthopedic doctor saw Smith for his hand.  Smith also admitted that the Jail had sick call procedures.  Viewing the facts and all reasonable inferences in a light most favorable to Smith, the Court concludes no defendant violated Smith's constitutional rights because they were not deliberately indifferent to his serious

medical needs for his hand and the Jail had created sick call procedures. The Court grants summary judgment in favor of Defendants on these claims and dismisses them.

### E.     Retaliation

Smith asserts Sheriff Holder, Nurse Grisham, Jail Administrator Green, Jailer Smith, and Dunklin County retaliated against him in violation of the First Amendment for filing grievances regarding his alleged inadequate medical care by transferring him to a medical observation cell, not answering call buttons when pressed by Smith, placing a wooden board over the window of his cell, placing him on lockdown all day, refusing him recreation time, turning off water to the showers, and tampering with his food.

To establish a retaliation claim, Smith must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). "The right to be free from retaliation for availing one's self of the prison grievance process has been clearly established in this circuit for more than twenty years." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013).

The record contains no evidence that any defendant retaliated against Smith. He has provided no evidence to establish that a defendant ever placed Smith on lockdown or tampered with his food. While there is evidence Smith missed some recreation time, call buttons were not answered, and a board was placed over the window of his cell, Smith presents no evidence these defendants ever ordered anyone to deny Smith his recreation time, not answer call buttons, or place a board over the window of his cell, much less that these defendants ordered these actions in retaliation for Smith using the prison grievance process.

The record makes clear that Dr. Pewitt and Nurse Grisham moved Smith to the medical observation cell multiple times because of issues Smith had in controlling his diabetes, not in retaliation for Smith filing prison grievances.[2]  Because Smith's blood sugar would increase when in general population, Dr. Pewitt ordered Smith, after the recommendation of Nurse Grisham, be placed in the medical observation cell.  When Smith's blood sugar was under control, Smith was moved back to general population.  In a retaliatory transfer claim, an inmate must show the transfer would not have occurred but for an unconstitutional, retaliatory motive, and Smith has not done so here.  *Sisneros v. Nix*, 95 F.3d 749, 752 (8th Cir. 1996).

Viewing the facts and all reasonable inferences in a light most favorable to Smith, the Court concludes no defendant violated Smith's constitutional rights because he has not established any defendant acted in retaliation against him for using the prison grievance process. The Court grants summary judgment in favor of Defendants on these claims and dismisses them.

F.      **Failure to Provide Call Buttons**

Smith asserts the Jail's failure to provide call buttons in each individual cell violates his Eighth Amendment rights because it creates an unsafe environment.  Smith brings this claim against Sheriff Holder and Dunklin County.

The conditions under which an institution confines a prisoner are subject to scrutiny under the Eighth Amendment.  *Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994).  However, "[r]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society. . ."  *Hudson v. McMillian*, 503 U.S. 1, 9, (1992).  Thus, a prison official violates the Eighth Amendment only when two requirements are met: "(1) the deprivation alleged is sufficiently serious – the prison official's act or omission results in the denial of the minimal

---

[2] In his complaint, Smith alleges he was placed in administrative segregation.  No facts support this allegation. Smith was placed in the medical observation cell.

civilized measure of life's necessities; and (2) the prison official acts with deliberate indifference – he knows of and disregards an excessive risk to inmate health and safety." *Brown*, 33 F.3d at 955 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

For pretrial detainees, the Court asks whether the conditions of confinement "amount to punishment of the detainee." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citing *Bell v. Wolfish*, 411 U.S. 520 (1979)). Under the Due Process Clause of the Fourteenth Amendment, a detainee may not be punished prior to an adjudication of guilt. *Id.* A particular condition of confinement does not amount to punishment if it reasonably relates to a legitimate governmental objective. *Id.*

Smith has not established that a failure to provide call buttons in every cell is an unconstitutional condition of confinement. Courts that have addressed the absence of call buttons in cells have uniformly found that it does not constitute a violation of the Eighth or Fourteenth Amendments. *See Parsons v. Wilkinson*, 490 F.3d 490 (6th Cir. 1998) (unpublished table decision) (finding the plaintiff failed to demonstrate that the absence of an emergency call button in his cell subjected him to a serious deprivation of life's necessities); *Garner v. City of Philadelphia*, No. 11-cv-5960, 2013 WL 4401327 at *6 (E.D. Pa. Aug. 16, 2013) (finding that although panic buttons may offer inmates additional safety and protection, the court could not find that panic buttons constitute a minimal civilized measure of life's necessities); *Torres v. Wright*, No. 3:17-cv-01919 JAM, 2018 WL 1175408 at *4 (D. Conn. Mar. 6, 2018) (finding that prisoners do not have an Eighth Amendment right to a cell equipped with an emergency call button); *Price v. Bailey*, No. 1:09-cv-12, 2009 WL 198962 at *3 (E.D. Mich. Jan. 26, 2009) (finding that a failure to provide an emergency call button does not constitute deliberate indifference). The Jail's failure to provide call buttons in each individual cell does not create an

unconstitutional condition of confinement and does not violate Smith's rights under the Eighth and Fourteenth Amendments. Viewing the facts and all reasonable inferences in a light most favorable to Smith, the Court concludes no defendant violated Smith's constitutional rights by failing to provide call buttons in each individual cell. The Court grants summary judgment in favor of Defendants on these claims and dismisses them.

### G. Dunklin County's Liability

Because Smith does not establish any constitutional violations by individual defendants, the Court need not address the issue of Dunklin County's liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) (municipal liability cannot be sustained where there has been no violation of the plaintiff's constitutional rights).

### H. ADA and RA

Smith asserts Defendants violated the ADA and RA by failing to provide handicap accessible showers with shower curtains and failing to turn on the water in the handicap accessible showers.

Title II of the ADA states: "no qualified individual shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the RA states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

With the exception of the RA's federal funding requirement, the ADA and RA are similar in substance and cases interpreting either are applicable and interchangeable. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998). This includes cases interpreting the definition of "disability" under the ADA and "handicap" under the RA, two substantially similar definitions. *Wooten v. Farmland Foods*, 58 F.3d 382, 385 n.2 (8th Cir. 1995). To state a claim under the ADA, a plaintiff must show "(1) he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit due to discrimination based upon disability." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). "The RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal financial assistance." *Id.* "'Recreational activities, medical services, and educational and vocational programs' at state prisons are benefits within the meaning of Title II." *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009) (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)).

The ADA defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority." 42 U.S.C. § 12131(1). State prisons, are within the statutory definition of "public entity." *Gorman*, 152 F.3d at 912. This term does not include individuals. *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); *see also K.L. v. Mo. State. High Sch. Activities Ass'n*, 178 F. Supp. 3d 792, 808 (E.D. Mo. 2016) (finding that individuals cannot be construed as a public entity under the ADA definition). Thus, the Court must grant summary judgment on the claims against Sheriff Holder, Jail Administrator, and Jailer Smith in their individual capacities because they do not qualify as "public entit[ies]."

Dunklin County argues Smith does not have a disability and he cannot show Dunklin County excluded him from a benefit due to discrimination based upon his disability. Whether diabetes qualifies as a disability under the ADA and RA is a question of fact based on the severity of the individual's diabetes. Courts across the country have found diabetes is a disability in some cases, and have found it is not in others. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir. 2011) (finding that the analysis of when and under what conditions diabetes is considered a disability is a matter of degree); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 33-35 (1st Cir. 2010) (finding that the existence of a disability is fact-intensive and individualized and in this case, the plaintiff's diabetes did not qualify as a disability because it did not substantially limit a major life activity); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923-26 (7th Cir. 2001) (finding the plaintiff's insulin-dependent diabetes qualified as a disability); *Fraser v. Goodale*, 342 F.3d 1032, 1038-39 (9th Cir. 2003) (finding that diabetes is a "physical impairment" under the ADA but deciding that whether diabetes qualified as a disability was a question of fact); *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 611 (W.D. N.Y. 2015) ("numerous courts have held that diabetes . . . is not necessarily a disability under the ADA.").

Here, the Court does not need to decide if Smith's diabetes qualifies as a disability, because even if he is disabled, he fails to establish Dunklin County excluded him from a benefit due to discrimination based upon his disability. The record contains no facts, either disputed or undisputed, showing that Smith told Dunklin County he needed to use a handicapped shower. To establish an ADA claim, Smith must show that he requested an accommodation and Dunklin County refused to provide it. *Lue v. Moore*, 43 F.3d 1203, 1206 (8th Cir. 1994). Unlike in *Kutrip v. City of St. Louis*,[3] a case cited by Smith, and other cases finding that a plaintiff does not

---

[3] 329 Fed. Appx. 683, 684-85 (8th Cir. 2009).

need to request an accommodation where the plaintiff's disability and need for accommodation is obvious,[4] here it is not obvious that Smith's diabetes caused him to need to use a handicap accessible shower.  The undisputed facts show that Smith never informed Dunklin County through Sheriff Holder, Jail Administrator, or Jailer Smith that he needed an accommodation, or that he did not have access to the handicap accessible showers that were available in the housing units.  Viewing the facts and all reasonable inferences in a light most favorable to Smith, the Court concludes Dunklin County did not violate Smith's rights under the ADA or RA because he has not shown Dunklin County was aware he needed an accommodation or that he did not have access to the handicap accessible showers already available.  The Court grants summary judgment in favor of Dunklin County on these claims and dismisses them.

## I.      State Law Claims

Smith asserts state law claims of medical malpractice, medical negligence, and breach of duty against Jail Administrator Green, and intentional infliction of emotional distress against Sheriff Holder and Jail Administrator Green.  The record contains no facts to support any of these claims.  First, to state a claim for intentional infliction of emotional distress, Smith must show that Sheriff Holder and Jail Administrator Green committed extreme and outrageous conduct that intentionally or recklessly caused Smith emotional distress that resulted in bodily harm, and he has not done so.  *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997).

Second, to establish a claim for medical malpractice, or medical negligence,[5] in Missouri, Smith must show that Jail Administrator Green is a "health care provider [that] failed to use [the]

---

[4] *See Robertson v. Las Animas Cty Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007) (collecting cases for proposition that entity will know of handicapped individuals need for accommodation under ADA when need is obvious).

[5] A claim for "medical negligence" is also referred to as "medical malpractice."  *Brown v. Bailey*, 210 S.W.3d 397, 404 (Mo. Ct. App. 2006).

degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and that such failure directly caused or contributed to cause [Smith's] injury." Mo. Rev. Stat. § 538.210.1. Smith does not show that Jail Administrator Green provided him any healthcare, or that she acted in a manner to directly cause or contribute to cause an injury to Smith. Finally, Smith's claim for breach of duty against Jail Administrator Green cannot stand because he did not establish what duty Jail Administrator Green owed him, nor did he provide any facts in support of a breach of duty by Jail Administrator Green. Because Smith provided no facts to support his claims, the Court dismisses Smith's state law claims against all defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Ashley Grisham and Dr. Charles Pewitt's Motion for Summary Judgment [126] is **GRANTED**. The Court dismisses all claims against Ashley Grisham and Dr. Charles Pewitt with prejudice.

**IT IS FURTHER ORDERED** that Defendants Bob Holder, Nicole Green, Jimmie Smith, and Dunklin County's Motion for Summary Judgment [129] is **GRANTED**. The Court dismisses all claims against Bob Holder, Nicole Green, Jimmie Smith, and Dunklin County with prejudice.

So Ordered this 2nd day of January, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**